**HAWKINS et al. v. EVERTS et al.**

No. 13290.

Court of Civil Appeals of Texas. Fort Worth.

Jan. 10, 1936.

Rehearing Denied March 20, 1936.

Kilgore &. Rogers, of Wichita Falls, for appellants.

Davenport & Loftin, of Wichita Falls, for appellees.

MARTIN, Justice.

This litigation began in the district court of Archer county on the 9th day of January, 1935, with the filing of a petition by W. M. Blake, as plaintiff, against C. A. Everts and C. T. Everts in form trespass to try title to a one-eighth overriding royalty interest in a leasehold estate in said county, also pleading specially facts which would, if proven, clear title to the same. This case was numbered on the docket of the Archer county court No. 3184.

On January 18, 1935, C. T. Everts filed a suit in the district court of Archer county for receivership of the same property, alleging conditions which called for immediate relief, and on the same day a receiver was appointed by the judge of said court. The receivership suit was numbered 3186. On February 19, 1935, under a written agreement of all interested parties, this suit was transferred to the Eighty-Ninth district court in Wichita county, where it was numbered by the clerk No. 28694; but on January 23d the parties appeared before the judge of said court, where a motion to vacate the receivership was sustained and the cause dismissed—there being no other issues presented in that case.

On February 19th cause No. 3184 was also transferred to the Eighty-Ninth district court in Wichita county, where it took the number 28755.

On March 11, 1935, the trespass to try title case came on for trial, a jury being waived, and all parties appeared and joined issue before Hon. A. D. Montgomery, judge of the Thirtieth district court, and, after a

full hearing, he entered judgment in favor of C. T. Everts for title to the interest in dispute, whereupon the appellants, interveners below, claiming title as assignors of Blake, excepted and bring the case to this court by appeal in proper form and manner.

■ It is first assigned by appellants as fundamental error that the judge of the Thirtieth district court had no right to sit and try the case, for the reason that it appears from the record that if pending at all, it was pending in the Eighty-Ninth district court and no record of transfer from that court appears in the transcript. However, counsel for appellants, Hon. Guy Rogers, in oral argument before this court, agreed that there was an assignment made by the writer who was, at that time, presiding judge of the Eighth administrative judicial district, duly recorded in the minutes of the three district courts of Wichita county, authorizing each of the three resident judges in said county to preside in and try cases in the courts of the others, and counsel further agreed that although this assignment is not shown in the transcript, the fact of its existence and record may be considered by this court. But we cannot avail ourselves of this generous offer, as under the rules of this court we must be confined to the consideration of the record.

The following is the written agreement of counsel in cause No. 28694, which is the case the judgment was entered in: "The above styled and numbered cause being called for trial, at Archer City, on the 18th day of February, A. D. 1935, attorneys John Davenport, representing defendants, Judge John C. Kay, representing the plaintiff and Judge Melville E. Peters representing the Interveners in open court stated that they had agreed to transfer said cause to Wichita County, Texas, for trial, and waived all matters of jurisdiction and venue and agreed that for convenience sake, that Judge Allan D. Montgomery, who is Judge of the 30th Judicial District of Texas, who holds court in Wichita County, Archer County, to try said cause in Wichita County, in the City of Wichita Falls, Texas, at any time convenient to him."

It is true that the order of transfer specifies the Eighty-Ninth district court of Wichita county, though the case was given the designation "A" by the clerk when it came from Archer county to Wichita county.

In the body of the judgment the following recitation appears: "And it appearing to the court that this case was filed in the 30th District Court of Archer County, Texas, originally, but on appearance day, by agreement of counsel and all parties, was transferred and removed to Wichita County, Texas, for trial and all questions of venue and jurisdiction were waived by said parties acting through their attorneys in open court, and same lawfully pends here."

It appears that we are confronted with a tangle here that is novel, to say the least, and it illustrates the necessity for the exercise of greater care by clerks, courts, and counsel in the making of a court record. The judgment appealed from, as shown by the transcript, was in cause No. 28694–A, and the same transcript shows that said cause was dismissed on January 23, 1935, when the receivership was vacated. The transcript also shows that at some unknown point in the litigation the numbers of the two cases were "switched" so that the number of the receivership case, No. 28694–A, became the number of the trespass to try title case, which was tried by Judge Montgomery.

■ Counsel for appellants present a great number of authorities supporting his proposition. It may not be amiss to state in this connection that the eminent counsel who present this appeal are not the same as those who represented the appellants in the trial court, and they have presented it from the record, as it is, and presented it with marked ability. But we think the question is settled against the contention of appellants by the decisions in this state. It is assigned as fundamental error here, no objection being made in the court below to the action of Judge Montgomery in trying the case. In such case, it seems that such objection cannot be raised here in the first instance. 25 Tex.Jur. p. 346, § 96, and authorities there cited.

■ It is quite clear that it was the real intention of the parties, as is indicated by the agreement quoted, to try the case in the Thirtieth district court in Wichita county, and the fact that in some way it got the wrong number should not, in our judgment, render the judgment void. The Thirtieth district court had original jurisdiction of the subject-matter of the suit, and we understand the law to be that where a court has jurisdiction of the subject-matter, a voluntary appearance and trial confers jurisdiction over the persons involved, amounting to a waiver. 11 Tex.Jur. p. 715, § 12, and authorities there cited. The right case, it is

true, was tried under the wrong number, but we feel that it would be a vain thing to reverse for this reason alone. But the record here shows that No. 28694 had been regularly dismissed in the Eighty-Ninth district court on January 23, 1935. Counsel for appellees have not briefed this question and do not offer in this court any explanation or excuse or even attempt to answer appellants' claim of fundamental error. As the real controversy was actually tried by the judge who had proper jurisdiction of the subject-matter and to whose jurisdiction all interested parties voluntarily submitted, we do not believe these irregularities would justify a reversal of the case.

■ By their second assignment, appellants attack the judgment as not supported by the evidence in the case. The one issue upon which the judgment depends is whether the assignment of interest made by W. M. Blake to C. A. Everts, on June 27, 1934, is in fact a mortgage, rather than an absolute conveyance of title. In terms, it conveys what is known in the oil fields as a one-eighth "overriding royalty" to Everts for a consideration of "one dollar and other good and valuable consideration." It bears no defeasance clause, so on its face it is a complete transfer of title to the interest specified. Appellants, who are subsequent vendees of Blake, claim, however, that in fact it is a mortgage, basing their claim upon the parol evidence introduced. That a muniment of title, absolute on its face, may be shown to be only a mortgage, given to secure debt, is well settled law in this state. Gibbs v. Penny, 43 Tex. 560; Stamper v. Johnson, 3 Tex. 1; Stafford v. Stafford, 29 Tex.Civ. App. 73, 71 S.W. 984–986.

■ It is equally well settled that the intention of the parties at the time of the execution and delivery of the writing may be shown by parol evidence. If the instrument was made to secure a debt and is to become defeasible upon the payment of the debt, it is in law a mortgage, however absolute it may be on its face. The testimony upon this question is brief, and we will quote such parts of it as seem to be most applicable.

Blake, the grantor, testified that being pressed for money, to drill a well, he borrowed $250 from C. A. Everts, the grantee, and executed and delivered the assignment to Everts with the express understanding that it was not to be immediately recorded but that he should have the opportunity to repay the loan and take up the assignment at any time, and that Everts promised to just "leave it on his desk" in his office at Dallas, for this purpose. Also that he visited Everts' office in Dallas six or eight times, but did not find him in, and at last in January, when he did get to see him, Everts told him he had given the assignment to his brother and was no longer interested in it. The defendant Everts testified as to the negotiation as follows: "He (Blake) said that he just had to have the $250.00 to spud in or the deal would be gone, and he thought it was a good thing, but he could not get the money and he said, 'I will tell you what I will do, if you will let me have the $250.00 I will give you a one-eighth overriding royalty and I will give you that with the understanding that if I make a well you will pay me $750.00 more, and if I don't make a well you don't owe me a cent,' and I said, 'All right, I don't want to see you lose your deal;' and he came back later in the day and gave me an assignment to the overriding royalty as he had said and at the time remarked that he could sell it for twice as much down in Dallas and that he was coming to Dallas the following Tuesday; and I said, 'Well I am going to California about Saturday, and if you can come to Dallas and sell it for twice that amount, you can come down and do it and pick this up; you can do it if you get there by the time I go to California, but if you don't get there by the time I go to California I will "ride" the whole matter' and he said 'I don't believe you realize that you have a bargain.'"

He further testified that Blake had never offered in person or by letter to repay the $250 until suit was brought.

Appellants contend that the testimony of the grantee Everts shows conclusively that the instrument was a mortgage because he gave the grantor the privilege to "pick it up" at any time before he went to California.

The decision of the whole matter in this case depends upon the construction to be given to this testimony of Everts. Was the trial court authorized to find that it was a complete transfer of title to the royalty when Everts himself testified that at the very time of its delivery to him he agreed that Blake could "pick it up" within the following week?

Counsel for appellants say in their able brief: "It was, during the time allowed for the payment of the debt, but security for the money advanced; being then a mort-

gage, it was ever a mortgage." Numerous authorities are cited in support of their contention, and we must say they are not answered in the brief of appellees. But a careful analysis of the language may lead to another and a vastly different conclusion. Everts agrees to hold the conveyance unrecorded until he leaves for California and up to that time Blake may pay off and "pick it up." But when Everts leaves he then, if he still has it, intends to "ride" the whole matter (which means, in the vernacular of the oil industry, that he will hold onto his interest and "play it out" with other interested parties).

This strongly suggests an oral agreement to reconvey in a specified time or an oral agreement to surrender the interest if Blake exercises his option within the specified time—in short, what the law denominates a conditional sale which was to become absolute upon the departure of Everts for California. 29 Tex.Jur. p. 818, § 23. So we see that the privilege of "picking it up" within a limited time did not necessarily constitute the instrument a mortgage, as claimed by the appellants. A very similar state of facts is disclosed in the case of Brown v. Hempkins (Tex.Civ.App.) 38 S. W.(2d) 173, where a sixty-day option to repurchase was given. It was held to be a conditional sale, and judgment for title and possession for the grantee was affirmed by our Waco Court of Civil Appeals (opinion by Gallagher, C. J.), citing many authorities in support of the judgment. 29 Tex. Jur. p. 818, § 24.

Although the question is not without difficulty, we think there is sufficient evidence in the record to support the judgment of the trial court upon the issue raised, and this assignment is therefore overruled.

The judgment of the trial court is affirmed.

## On Motion for Rehearing.

### DUNKLIN, Chief Justice.

We have reviewed the authorities cited by counsel in their elaborate and able motion for rehearing, in which it is insisted that the testimony introduced shows conclusively that the instrument in controversy was a mortgage and not a conditional sale, as announced in the opinion of Justice MARTIN on original hearing.

Defendant Blake testified, in substance, that he borrowed from C. A. Everts $250 with which to finish a well he was then drilling and executed to Everts the instrument in controversy to secure its payment; that he did not execute a note for the sum borrowed and Everts told him he was lending the money as an accommodation, and that he (Blake) could repay it "just any time I got able to pay it." And with the further agreement that if the well then being drilled proved to be a producer, Everts would have the option to pay him $750 additional and retain title to the one-eighth royalty which the instrument purported to convey.

C. A. (Chet) Everts testified that plaintiff Blake told him he was in urgent need of $250 in order to spud in a well to save a forfeiture of his lease, "and he said, 'I will tell you what I will do if you will let me have the $250.00 I will give you a one-eighth overriding royalty and I will give you that with the understanding if I make a well you pay me $750.00 more and if I don't make a well you don't owe me a cent,' and I said, 'All right, I don't want to see you lose your deal'; and he came back later in the day and gave me an assignment to the overriding royalty as he had said and at the same time remarked that he could sell it for twice as much down in Dallas and that he was coming to Dallas the following Tuesday, and I said, 'Well I am going to go to California about Saturday, and if you can come to Dallas and sell it for twice that amount you can come down and do it and pick this up, you can do it if you get there by the time I go to California, but if you don't get there by the time that I go to California I will "ride" the whole matter' and he said, 'I don't believe you realize that you have a bargain.'"

He further testified that he was not in the loan business; that Blake never offered to pay back the $250 until after witness had returned from California and the well had been finished, and never wrote him a letter in the meantime offering a return of the money before this suit was filed. He further testified that he went to California about one week after the instrument was executed, and while there was informed that Blake had spudded in the well on the 60-acre lease, of which the property in controversy was a part, and then directed Mr. Harris, his local representative, to file the assignment for record, and after his return from California he sold to his brother, C. T. Everts, plain-

tiff, the interest covered by the instrument. He further testified as follows:

"Q. Now, let's see, you were to get this assignment—and you were to pay $750.00 more if a commercial well was made—but you advanced him $250.00? A. Yes, he said that he needed it.

"Q. Well, did you require any security of him for the $250.00? A. No, not any other than the assignment which was an absolute assignment.

"Q. And your idea is that even though you had transferred this property out of your hands that you still owed him $750.00 if he made a producer, is that your idea of it? A. Yes, sir. I will explain it to you again; I bought the property for $250.00 with the understanding that there was to be $750.00 more paid if a producing well—and until it was a producing well I did not owe any more—and of course, by my transferring the assignment, that did not relieve me of the obligation—that was just a deal I had myself and I am ready to pay the $750.00."

Joe Art testified he was present in Everts' room in the Kemp Hotel when Blake applied to him for the $250.

"Q. Now, did you hear any conversation that day about Mr. Everts loaning Mr. Blake the $250.00? A. No, sir, he bought an interest.

"Q. Did you hear anything mentioned at all about an interest—did you hear anything at all about a loan? A. No.

"Q. State to the court, in the presence of Mr. Blake, if Chet did not offer to sell you a one-half interest in the interest that he was getting from Blake? A. I don't remember exactly. He might have— on several occasions Everts did offer me an interest, but I don't remember exactly if it was this one, or not."

Witness further testified that he was not interested in the controversy in any way.

John W. Harris, who was employed by C. A. Everts to look after his oil interests, testified that during the time Mr. Blake was drilling his well witness was frequently on the lease and met Blake.

"Q. Prior to January 1, 1935, did Mr. Blake ever discuss with you about Mr. C. A. Everts owing him anything? A. No.

"Q. I will ask you to state whether or not Mr. Blake stated to you that Mr. Everts owed him $750.00 when the well was completed? A. After he got a well Blake told me that he had $750.00 coming.

"Q. Did he ever ask you for it? A. Yes.

"Q. Why didn't you pay him? Did you have authority to pay him? A. No, sir, I did not.

"Q. Why didn't you get the money from Everts to pay him? A. As I understood it, if it was a commercial well, Everts was to give $750.00, and it was not determined whether it was a commercial well so far as I could find out.

"Q. Did you make any trips down there to see if it was a commercial well? A. Yes, sir, I did.

"Q. At whose instance did you make those trips? A. Mr. Everts.

"Q. Was it on the pump, or was there any oil being pumped when you were there? A. Not until several days ago there was not.

"Q. Even after that were you able to determine or tell whether it was a commercial well or not? A. No, sir."

■ "Since a conveyance cannot be a mortgage unless given to secure the performance of an obligation, the existence of an obligation to be secured is an essential element without which the mortgage instrument is but a shadow without substance." 19 R.C.L., § 68, p. 289.

■ If Blake was not indebted to Everts for the $250 after he executed the assignment to him, then there could be no proper basis for the claim that the assignment should be given effect as a mortgage under any of the authorities invoked by appellant. And in view of the testimony of Everts, corroborated by that of Art and Harris, and circumstances such as the absence of any written obligation of Blake to pay the $250 and the fact that the assignment was in terms an absolute conveyance of title, we believe it manifest that appellant's contention that the evidence showed conclusively that the assignment was in fact intended as a mortgage is without merit.

The motion for rehearing is overruled.